**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**BOBBY R.,**

     **Plaintiff,**

          **v.**                                                    **5:20-CV-875**
                                                                    **(FJS)**

**COMMISSIONER OF SOCIAL SECURITY,**

     **Defendant.**

_____

**APPEARANCES**                              **OF COUNSEL**

**LAW OFFICES OF KENNETH**          **JUSTIN M. GOLDSTEIN, ESQ.**
**HILLER, PLLC**                              **KENNETH R. HILLER, ESQ.**
6000 North Bailey Avenue
Suite 1A
Amherst, New York 14226
Attorneys for Plaintiff

**SOCIAL SECURITY ADMINISTRATION**   **RAMI M. VANEGAS, SAUSA**
J.F.K. Federal Building, Room 625
15 New Sudbury Street
Boston, Massachusetts 02203
Attorneys for Defendant

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiff Bobby R. brought this action pursuant to the Social Security Act, 42 U.S.C.

§§ 405(g) and 1383(c)(3) (the "Act"), seeking judicial review of a final decision of the

Commissioner of Social Security (the "Commissioner"), denying his application for benefits. *See generally* Dkt. Nos. 1, 14.  Pending before the Court are the parties' cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  *See* Dkt. Nos. 14, 19.

## II. PROCEDURAL HISTORY AND BACKGROUND

Plaintiff applied for benefits on July 28, 2016, alleging disability as of April 2, 2013. *See* Dkt. No. 12, Administrative Record ("AR") at 289.[1]  Plaintiff filed a timely request for a hearing on February 13, 2017.  *See id.* at 141-43.  A hearing was held on October 9, 2018, before Administrative Law Judge Jennifer Gale Smith (the "ALJ") in Syracuse, New York. *See id.* at 60-92.  Plaintiff's attorney, Mr. Mark Laudisio, represented him at the hearing; and a vocational expert ("VE"), Ms. Marissa Howell, testified.  *See id.* at 62.  Plaintiff amended his alleged onset date of disability to his date of filing at the first hearing.  *See id.* at 83.  The ALJ held a second hearing on April 16, 2019, at which Plaintiff failed to appear; but the ALJ took medical expert Jeffrey Hansen, M.D.'s testimony that his report fairly and accurately depicted the limitations that he believed were appropriate for Plaintiff.  *See id.* at 94-98.  The ALJ then held a third hearing on August 8, 2019, at which Matthew Nutting, a non-attorney representative, represented Plaintiff and VE David A. Festa testified.  *See id.* at 33-58.

---

[1] All references to page numbers in the Administrative Record are to the Bates Stamp numbers in the bottom right corner of those pages.  All references to page numbers in other documents in the record are to the page numbers that the Court's ECF system generates, which appear in the top right corner of those pages.

On August 28, 2019, the ALJ issued a written decision in which she made the following

findings "[a]fter careful consideration of the entire record…"

1) Plaintiff "has not engaged in substantial gainful activity since July 28, 2016, the application date."

2) Plaintiff "has the following severe impairments: herniated disc at L4-5 and L5-S1, a knee impairment, and borderline intellectual functioning."

3) Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404 Subpart P, Appendix 1."

4) Plaintiff "has the residual functional capacity to perform less than a full range of sedentary work, as defined in 20 CFR 416.967(a). Specifically, [Plaintiff] can frequently lift up to 10 pounds, occasionally carry up to 10 pounds, and occasionally lift and carry between 11 and 20 pounds. [Plaintiff] can sit for six hours in an eight-hour day and for two hours at a time. [Plaintiff] can stand for four hours in an eight-hour day and for one hour at a time. [Plaintiff] can walk for two hours in an eight-hour day and for 30 minutes at a time. [Plaintiff] can frequently reach in all directions other than overhead and can occasionally reach overhead. [Plaintiff] can occasionally push, pull, and use foot controls. He can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. [Plaintiff] should not climb ladders, ropes, or scaffolds. [Plaintiff] should not work at unprotected heights, climb ladders, or work in close proximity to dangerous machinery or moving mechanical parts of equipment. [Plaintiff] should have occasional exposure to extreme cold and vibrations. [Plaintiff] can frequently operate a motor vehicle and come in contact with humidity, wetness, odors, fumes, gases, and extreme heat. [Plaintiff] should not work in a noise environment above loud. He can perform simple routine repetitive tasks and should perform a job with a reasoning general education development (GED) of two and language and math GED of one."

5) Plaintiff "has no past relevant work."

6) Plaintiff "was born on March 3, 1972 and was 44 years old, which is defined as a younger individual age 18-44, on the date the application was filed. The claimant subsequently changed age category to a younger individual age 45-49."

7) Plaintiff "has at least the equivalent of a high school education and is able to communicate in English."

8) "Transferability of job skills is not an issue because [Plaintiff] does not have past relevant work."

9)   "Considering [Plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform."

10)  Plaintiff "has not been under a disability, as defined in the Social Security Act, from July 28, 2016, the date the application was filed."

*See* AR at 12-22 (citations omitted).

The ALJ's decision became the Commissioner's final decision on June 5, 2020, when the Appeals Council of the Social Security Administration denied Plaintiff's request for review. *See* AR at 1-5.  Plaintiff then commenced this action on August 4, 2020, filing a supporting brief on March 12, 2021.  *See* Dkt. Nos. 1, 14.  Defendant filed a responding brief on June 25, 2021. *See* Dkt. No. 19.  In support of his motion, Plaintiff argues that the ALJ's physical and mental residual functional capacity ("RFC") determinations are unsupported by substantial evidence, that the VE failed to identify jobs with significant numbers in the national economy, and that the ALJ improperly found Plaintiff's subjective complaints inconsistent with the evidence.  *See generally* Dkt. No. 14 at 12-25.


### III. DISCUSSION

**A.  Standard of review**

Absent legal error, a court will uphold the Commissioner's final determination if there is substantial evidence to support it.  *See* 42 U.S.C. § 405(g).  The Supreme Court has defined substantial evidence to mean "'more than a mere scintilla'" of evidence and "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted).  Accordingly, a reviewing court "'may not substitute [its] own judgment for that of the [Commissioner], even if [it] might justifiably have reached a different result upon a de novo review.'"  *Cohen v. Comm'r of Soc. Sec.*, 643 F.

App'x 51, 52 (2d Cir. 2016) (Summary Order) (quoting *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).  In other words, "[t]he substantial evidence standard means once an ALJ finds facts, [a reviewing court may] reject those facts 'only if a reasonable factfinder would *have to conclude otherwise*.'"  *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (quotation and other citation omitted).

To be eligible for benefits, a claimant must show that he suffers from a disability within the meaning of the Act.  The Act defines "disability" as an inability "to engage in any substantial gainful activity [("SGA")] by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  To determine if a claimant has sustained a disability within the meaning of the Act, the ALJ follows a five-step process:

1) The ALJ first determines whether the claimant is currently engaged in SGA.  *See* C.F.R. §§ 416.920(b), 416.972.  If so, the claimant is not disabled.  *See* 20 C.F.R. § 416.920(b).

2) If the claimant is not engaged in SGA, the ALJ determines if the claimant has a severe impairment or combination of impairments.  *See* 20 C.F.R. § 416.920(c).  If not, the claimant is not disabled.  *See id.*

3) If the claimant has a severe impairment, the ALJ determines if the impairment meets or equals an impairment found in the appendix to the regulations (the "Listings").  If so, the claimant is disabled.  *See* 20 C.F.R. § 416.920(d).

4) If the impairment does not meet the requirements of the Listings, the ALJ determines if the claimant can do his past relevant work.  *See* 20 C.F.R. § 416.920(e), (f).  If so, the claimant is not disabled.  *See* 20 C.F.R. § 416.920(f).

5) If the claimant cannot perform his past relevant work, the ALJ determines if he can perform other work, in light of his RFC, age, education, and experience.  *See* 20 C.F.R. § 416.920(f), (g).  If so, then he is not disabled.  *See* 20 C.F.R. § 416.920(g). A claimant is only entitled to receive benefits if he cannot perform any alternative gainful activity.  *See id.*

For this test, the burden of proof is on the claimant for the first four steps and on the
Commissioner for the fifth step if the analysis proceeds that far.  *See Balsamo v. Chater*, 142
F.3d 75, 80 (2d Cir. 1998) (citation omitted).

**B.  The ALJ's RFC finding**

      Plaintiff first contends that the ALJ's RFC findings are not supported by the substantial
evidence in the record.  The ALJ analyzed Plaintiff's physical and mental RFCs separately and
addressed Plaintiff's subjective complaints throughout her assessment.  The Court analyzes the
ALJ's physical and mental RFC findings in turn before considering whether the Commissioner
met her burden at the fifth step.

     *1.  Physical RFC*

      Plaintiff asserts that the ALJ improperly relied exclusively on Jeffrey Hansen, M.D.'s
medical source statement, even though it had various issues, including that Dr. Hansen did not
explain his findings.  *See* Dkt. No. 14 at 14.  Plaintiff also complains that Dr. Hansen reviewed
Louis A. Fuchs, M.D.'s opinion, which the ALJ ultimately afforded no weight, but because of
Dr. Hansen's unexplained findings it is unclear what impact Dr. Fuchs's opinion had on Dr.
Hansen's conclusions.  *See id.* at 14.  Furthermore, Plaintiff asserts that, when Dr. Hansen
reviewed the record, it only contained Dr. Fuchs's and Kalyani Ganesh, M.D.'s opinions.  *See id.*
at 19.  According to Plaintiff, he submitted significant evidence following Dr. Hansen's review,
including nine opinions and over 450 pages of treatment notes from New York Spine &
Wellness relating to his surgical procedures.  *See id.*  Plaintiff argues that Dr. Hansen's findings
are thus "unexplained and are now contradicted by the updated treatment notes and opinions."

*See id.* at 20.  Plaintiff further asserts that, although the ALJ gave reasons for the weight she

afforded Dr. Hansen's opinion, the ALJ did not apply the regulatory factors and failed to

identify any evidence consistent with or in support of Dr. Hansen's opinion.  *See id.* at 16.

According to Plaintiff, when applying the regulatory considerations, none of those factors

support the ALJ's adoption of Dr. Hansen's opinion.  *See id.* at 17.

Plaintiff also argues that he was denied an opportunity to cross-examine Dr. Hansen.

*See id.* at 17-18.  Plaintiff concedes that Dr. Hansen testified at the second hearing, but he

asserts that his prior attorney withdrew as counsel and that, because he had not obtained new

representation, he did not attend that hearing.  *See id*.  Nonetheless, Plaintiff notes that the ALJ

did not take any "substantive testimony" from Dr. Hansen at the second hearing, and the ALJ

did not have Dr. Hansen appear to testify for cross-examination at the third hearing.  *See id*. at

18.  Thus, Plaintiff argues, Dr. Hansen never explained his answers in person and did not

provide a narrative explaining his written answers in his medical source statement.  *See id.*

Accordingly, Plaintiff claims that Dr. Hansen's opinion amounted to nothing but "'completed

check box forms[.]'"  *See id.* (citing AR at 19).

Lastly, Plaintiff asserts that the ALJ wrongly discounted Maygoe Sheehan, M.D.'s

opinion in her physical RFC finding.  *See id.*  Plaintiff notes that Dr. Sheehan was his treating

physician; and, therefore, his opinions were entitled to deference under the regulations.  *See id.*

Plaintiff also argues that the ALJ selectively applied Dr. Sheehan's findings.  *See id.*

"In formulating an RFC the ALJ will afford weight to the medical opinion evidence in

the record." *Hatounian v. Comm'r of Soc. Sec.*, No. 3:15-CV-1194 (GTS/WBC), 2017 WL

9487189, *3 (N.D.N.Y. Jan. 12, 2017), *adopted by* 2017 WL 605294 (N.D.N.Y. Feb. 15, 2017)

(Suddaby, C.J.).  "The relevant factors considered in determining what weight to afford an

- 7 -

opinion include the length, nature and extent of the treatment relationship, relevant evidence which supports the opinion, the consistency of the opinion with the record as a whole, and the specialization (if any) of the opinion's source." *Id.* (citing 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6)).  In cases in which the claimant filed his or her application for benefits prior to March 27, 2017, as Plaintiff did here, the ALJ is also bound by the "treating physician rule." *See, e.g.*, *Sarah S. v. Comm'r of Soc. Sec.*, No. 5:20-CV-0300 (ML), 2021 WL 3723106, *5 n.2 (N.D.N.Y. Aug. 23, 2021) (Lovric, M.J.).  "That rule mandates that the medical opinion of a claimant's treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).  As relevant here, "courts have routinely recognized the failure to provide a requested narrative explanation on a check box form as a legitimate reason for affording a treating source opinion limited weight." *Dawn P. v. Berryhill*, No. 6:17-CV-1265 (DJS), 2019 WL 1024279, *6 (N.D.N.Y. Mar. 4, 2019) (Stewart, M.J.) (collecting cases).

In the Medical Interrogatory of Plaintiff's physical impairments, Dr. Hansen indicated that he reviewed all of the evidence he received, including objective medical evidence, and formed opinions about the nature and severity of Plaintiff's impairments.  *See* AR at 762.  When asked to specify Plaintiff's impairments, Dr. Hansen identified that Plaintiff suffered from chronic low back pain and complaints of knee pain.  *See id.*  With respect to Plaintiff's low back pain, Dr. Hansen noted that Plaintiff was diagnosed with myofascial pain with mild degenerative disc disease.  *See id.*  Dr. Hansen also noted Plaintiff's reports of leg pain but noted that he did not have any neurological deficits.  *See id.*  After reviewing Plaintiff's lumbar MRI, he concluded that Plaintiff had a mild disc bulge at L3, a broad-based disc bulge at L4-5 that was slightly flattening the sacral spine and possibly abutting right and left nerve roots, and

additional disc spacing and bulging at L5-S1, abutting S1 roots and lateral receptors. *See id.*
With respect to Plaintiff's knee, Dr. Hansen noted that the exam and X-ray were normal. *See id.*

Dr. Hansen then concluded that Plaintiff's impairments, combined or considered separately, did not meet or equal any impairment in the Listings. *See id.* at 763. With respect to Plaintiff's back pain, Dr. Hansen indicated that Plaintiff did not have any neurological deficits and had a generally reasonable, normal gait. *See id.* Additionally, Plaintiff had a negative straight leg raise and a normal neurological exam. *See id.* Although Dr. Hansen found that Plaintiff had "somewhat limited motion," he also noted Plaintiff's "poor cooperation." *See id.* Dr. Hansen further indicated that Plaintiff's lumbar spine was tender to palpations, he had low back pain without any radiation, and he had reasonable range of motion with only some pain. *See id.* Additionally, regarding Plaintiff's knee pain, Dr. Hansen indicated that Plaintiff could have minor damage, but – with a normal X-ray – he did not satisfy the Listings requirements. *See id.* Dr. Hansen also noted with respect to Plaintiff's knee pain that he appeared to be able to walk one block at a reasonable pace. *See id.*

When asked in the Interrogatories about Plaintiff's "functional limitations or restrictions," Dr. Hansen responded with "See MSS [medical source statement]." *See id.* at 764. In the medical source statement, Dr. Hansen checked various boxes indicating that Plaintiff could never lift more than 21 pounds, could occasionally lift 11 to 20 pounds, and could frequently lift up to 10 pounds. *See id.* at 765. Dr. Hansen also found that Plaintiff could occasionally carry up to 20 pounds. *See id.* Dr. Hansen concluded that Plaintiff could sit for two hours at a time, up to six hours in an eight-hour workday, could stand for one hour at a

time,[2] up to four hours in an eight-hour workday, and could walk for 30 minutes, up to two hours in an eight-hour workday. *See id.* at 766. Dr. Hansen also determined that Plaintiff would not require a cane to ambulate. *See id.*

With respect to Plaintiff's use of his hands, Dr. Hansen concluded that Plaintiff could reach overhead bilaterally occasionally and do all other kinds of reaching frequently. *See id.* at 767. Dr. Hansen found that Plaintiff could continuously handle, finger, and feel bilaterally and could occasionally push and pull bilaterally. *See id.* He also concluded that Plaintiff could occasionally operate foot controls with both feet. *See id.* Dr. Hansen further determined that Plaintiff could occasionally climb ladders or scaffolds, stoop, kneel, crouch, and crawl, and could frequently climb stairs and ramps and balance. *See id.* at 768.

Regarding any environmental limitations, Dr. Hansen determined that Plaintiff could occasionally work at unprotected heights, move mechanical parts, and tolerate extreme cold and vibrations. *See id.* at 769. He also found that Plaintiff could frequently operate a motor vehicle and tolerate humidity, wetness, dust, odors, fumes, pulmonary irritants, and extreme heat. *See id.* Dr. Hansen concluded that Plaintiff could work in loud noise conditions. *See id.* Dr. Hansen also found that Plaintiff could shop, travel without a companion, walk without assistance, walk a block at a reasonable pace on rough surfaces, use public transportation, climb a few steps, prepare a meal and feed himself, care for his personal hygiene, and sort and handle

---

[2] Dr. Hansen marked that Plaintiff could stand for one minute at a time on the medical source statement. However, based on his other remarks in the statement and Interrogatory, it appears that this was a typographical error and that Dr. Hansen intended to state that Plaintiff could stand for one hour at a time, up to four hours in an eight-hour workday. *See* AR at 766.

paper files.  *See id.* at 770.  Notably, Dr. Hansen did not include any narratives in his medical source statement to support any of these findings.  *See id.* at 765-70.

In the ALJ's physical RFC assessment, she relied on Dr. Hansen's opinion, as the medical expert, with respect to the amount of weight that Plaintiff could lift and carry, the amount of time that he could sit, stand, and walk in an eight-hour workday, and how frequently he could reach, push, pull, operate foot controls, finger, climb, balance, kneel, stoop, crouch, crawl, tolerate environmental extremes, and that he did not require a cane to ambulate.  *See id.* at 19.  "Given his specialty, programmatic knowledge, and review of the records available at the time, along with the support found in the overall record," the ALJ gave Dr. Hansen's opinion "considerable weight."  *See id.*

As described above, Plaintiff faults the ALJ for giving such weight to Dr. Hansen's opinions for various reasons, including the following: (1) Dr. Hansen did not include narratives to support his opinions; (2) Dr. Hansen did not review new records – including more than 450 pages of treatment records – in formulating his opinions; (3) Plaintiff did not have the opportunity to cross-examine Dr. Hansen; and (4) the ALJ did not discuss specific factors as the Act requires.  *See* Dkt. No. 14 at 17-19.  Generally, medical experts are asked to elaborate on their opinions with written statements on the medical source and interrogatory forms, and "'[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best.'"  *Mix v. Astrue*, No. 09-CV-0016, 2010 WL 2545775, *5 (W.D.N.Y. June 18, 2010) (quoting *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993)).  In this case, however, Dr. Hansen provided various notes and narrative statements explaining the rationale for his opinion and the records on which he relied in coming to his opinion in the Interrogatory.

- 11 -

*See* AR at 762-763.  The ALJ was therefore free to rely on Dr. Hansen's medical opinion and the statements in those forms.

The Court further finds that Dr. Hansen's review of the incomplete record does not render the ALJ's reliance on it improper.  Medical source opinions that are based on an incomplete medical record may not constitute substantial evidence supporting an ALJ's finding unless those opinions are "'supported by substantially similar findings in treatment notes and other opinions in the record[.]'"  *Murphy v. Comm'r of Soc. Sec.*, No. 6:16-CV-1268 (GTS/WBC), 2017 WL 8895352, *8 (N.D.N.Y. Oct. 24, 2017) (Suddaby, C.J.) (citing *Camille v. Colvin*, 104 F. Supp. 3d 329, 343-344 (W.D.N.Y. May 19, 2015)); *see Griffith v. Astrue*, No. 08-CV-6004 CJS, 2009 WL 909630, *9 n.9 (W.D.N.Y. Mar. 31, 2009).  Although Plaintiff complains that Dr. Hansen did not review office treatment records from Jobs Plus and Heritage One Day Surgery, *see* AR at 772-1294, many of the treatment notes and documents contained within those submissions are copies that are elsewhere in the record.  Those records also pertain to Plaintiff's chronic low back pain, the types of treatment that he used, and his lack of pain relief with those treatments.  *See id.*  Thus, the Court finds that the additional records were substantially similar to the records on which Dr. Hansen relied in coming to his conclusions.

With respect to cross-examination, a plaintiff does not have an absolute due process right to cross-examine a medical source, particularly if the record is complete without such cross-examination, there is no evidence that the medical opinion in question is inaccurate or biased, and there is no indication that subpoenaing the medical expert would have added anything of value to the proceedings.  *See Rotolo v. Comm'r of Soc. Sec.*, No. 6:16-CV-1252 (WBC), 2017 WL 6343673, *5 (N.D.N.Y. Dec. 11, 2017); *Christy v. Comm'r of Soc. Sec.*, No. 5:13-CV-1552 (GTS/WBC), 2015 WL 6160165, *12-*13 (N.D.N.Y. Sept. 24, 2015); *Yancey v.*

*Apfel*, 145 F.3d 106, 113 (2d Cir. 1998).  In this case, Plaintiff's initial counsel requested to cross-examine Dr. Hansen but then withdrew as counsel before the second hearing.  Plaintiff failed to appear at the second hearing in which Dr. Hansen appeared and briefly testified.  After Plaintiff obtained new representation, his representative did not request an opportunity to cross-examine Dr. Hansen.  Furthermore, there was a complete record before the ALJ with nearly one-thousand pages of treatment records, medical opinions, progress notes, interrogatories, and medical source statements.  *See* AR at 389-1330.  For these reasons, the Court finds that Plaintiff did not have an absolute right to cross-examine Dr. Hansen.

Regarding Dr. Hansen's opinion, Plaintiff further argues that the ALJ did not consider the relevant factors, as the Act requires, when finding it credible.  *See* 20 C.F.R. § 404.1527(c)(1)-(6).  The Court finds this argument to be without merit.  The ALJ clearly stated that the overall record supported Dr. Hansen's findings and addressed those findings, as discussed more fully below, which included Plaintiff's X-ray and MRI results, treatment notes, and his subjective complaints.  *See* AR at 19.  The ALJ also discussed consistencies between Dr. Ganesh's findings, including that Plaintiff does not need a cane to ambulate.  *See id.*  The ALJ additionally pointed to the fact that Dr. Hansen was an orthopedic surgeon with programmatic knowledge relating to Plaintiff's debilitations and that his findings were based on his review of the available records.  *See id.*  The ALJ therefore properly considered the relevant factors when affording Dr. Hansen's opinion considerable weight.  *See id.*

The ALJ also considered two other state agency physicians' opinions.  With respect to Louis Fuchs, M.D., the ALJ did not give his opinion any weight "because he could not be

- 13 -

produced for cross-examination."[3]  *See id.*  In addition, Kalyani Ganesh, M.D., examined

Plaintiff in May and December 2016.  *See id.* at 17-18, 513-515, 782-785.  With respect to the

May 2016 examination, the ALJ noted that Dr. Ganesh found "no evidence of limitation" in

Plaintiff's ability to walk, stand, sit, use his hands, and climb, and that Plaintiff could lift and

carry 20 pounds occasionally and 10 pounds frequently.  *See id.* at 18, 783.  The ALJ

determined that that, although Dr. Ganesh personally examined Plaintiff, "the totality of the

record, including the objective medical evidence and other opinions of record, supported

walking, standing, and climbing limitations"; the ALJ therefore gave Dr. Ganesh's May 2016

opinion limited weight.  *See id.* at 18.  As for Dr. Ganesh's December 2016 opinion, the ALJ

quoted Dr. Ganesh's remark that Plaintiff's "'overall effort and cooperation was poor[.]'"  *See id.*

at 19, 515.  Although Plaintiff had poor effort and cooperation, Dr. Ganesh noted that he did not

appear to be in acute distress, did not need help getting on and off the exam table, had a normal

gait and stance, negative straight-leg raising tests bilaterally, 5/5 strength, and did not appear to

need to use a cane.  *See id.* at 19, 514-515.  The ALJ gave "some weight" to Dr. Ganesh's

---

[3] Plaintiff argues that Dr. Hansen's opinion "was based upon an incomplete record, including the unreliable opinion of [Dr.] Fuchs."  *See* Dkt. No. 14 at 19.  However, there is nothing in the record to explain why Dr. Fuchs's opinion is "unreliable."  The ALJ did not discount it as unreliable; instead, the ALJ discounted it because Dr. Fuchs was unavailable for cross-examination.  *See* AR. at 19.  Furthermore, Dr. Hansen does not indicate how much he relied on Dr. Fuchs's opinion, if at all, in coming to his own conclusions.  In fact, the ALJ could have concluded that Dr. Hansen did not rely on Dr. Fuchs's opinion because Dr. Hansen's opinion imposed less severe restrictions compared to Dr. Fuchs's opinion in various areas.  For example, Dr. Hansen determined that Plaintiff could sit for no more than six hours in an eight-hour workday and walk for no more than two hours, whereas Dr. Fuchs found that Plaintiff could sit for all eight hours and walk for three hours in an eight-hour workday.  *See id.* at 737, 766.  The Court therefore rejects Plaintiff's argument on this issue.

opinion regarding Plaintiff's use of a cane based on Dr. Ganesh's personal examination and the opinion's consistency with Dr. Hansen's findings. *See id.* at 19.

In addition to the state agency physicians' opinions, the ALJ pointed to Plaintiff's testimony that he alleged pain, muscle spasms, numbness, trouble sleeping, using a cane, balance problems, and a limited ability to sit, stand, walk, lift, bend, and climb stairs. *See id.* at 17. Nonetheless, the ALJ found that, with conservative treatment, Plaintiff had reported in December 2016, October 2018, and August 2019, that he lived alone and cared for his two young children, cooked, cleaned, did laundry, shopped, cleaned the children's rooms, made beds, and sometimes used the bus. *See id.* at 17. The ALJ found that Plaintiff's treatment was conservative in that he had received medication management, nerve blocks, and radiofrequency ablation; however, in November 2014, January 2015, and April 2015, Plaintiff's lab work was negative for his prescribed medications (oxycodone and tramadol). *See id.* at 16. Furthermore, Plaintiff's provider noted in January 2018 that he "[did] well with injection therapy[.]" *See id.* at 17, 665.

With respect to Plaintiff's subjective complaints, the ALJ must consider relevant factors, including the following: (1) Plaintiff's daily activities; (2) the location, duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication Plaintiff took to alleviate pain; (5) treatments, other than medication, to relieve his pain; (6) measures Plaintiff may have used to relieve his pain; and (7) other factors concerning his functional limitations and restrictions. *See* 20 C.F.R. § 416.939(c)(3). In this case, the ALJ identified various daily activities that Plaintiff reported he could do, the types of medication he received, whether he used those medications, their effectiveness, consistencies between his complaints and the medical evidence, and his reported

symptoms.  Altogether, the Court finds that the ALJ appropriately considered the above-stated factors and found some inconsistencies in Plaintiff's subjective complaints in determining whether they were credible.

The ALJ also looked at Plaintiff's MRI and X-ray reports when coming to her conclusions, noting that Plaintiff's September 2014 MRI indicated that he had a herniated nucleus puposous at L4-5 and L5-S1.  *See* AR at 16, 396.  In addition, Plaintiff's December 2016 X-ray of his lumbosacral spine evidenced degenerative disc disease.  *See id.* at 16, 516. Although Plaintiff complained of knee pain and reduced range of motion, his August 2018 X-ray of his right knee was negative.  *See id.* at 17, 583.

The ALJ further addressed each of Plaintiff's provider's opinions and indicated how credible, if at all, she found them.  *See id.* at 17-19.  For example, the ALJ reviewed Family Nurse Practitioner Zoryana Moreau's 2013 report indicating that Plaintiff was "moderately limited" in his ability to walk, stand, sit, push, pull, bend, lift, carry, climb, and use public transportation.  *See id.* at 17, 801-803.  F.N.P. Moreau also opined in April 2015 that Plaintiff could not lift more than 10 pounds and that he was moderately limited in his ability to walk, stand, sit, lift, carry, push, pull, bend, and climb.  *See id.*  The ALJ indicated that those opinions were provided on "check box forms without explanation or support for the reported limitations"; and, therefore, she gave F.N.P. Moreau's opinion limited weight.  *See id.* at 17.

The ALJ also reviewed Roy Smith, M.D.'s December 2013 report, in which he indicated that Plaintiff should not lift above 15 pounds, was moderately limited in his ability to walk, stand, lift, carry, push, pull, bend, and climb, and did not have limitations in his ability to sit or use his hands.  *See id.* at 17, 468.  The ALJ concluded that Dr. Smith's opinion was "generally

consistent with the overall record"; but, because "he did not quantify the majority of the limitations," the ALJ only gave his opinion "some weight." *See id.* at 17.

In July 2016, Family Nurse Practitioner Melissa Torrez opined that Plaintiff was severely limited in his ability to lift/carry, push, pull, and bend and was moderately limited in his ability to walk, stand, sit, and climb. *See id.* at 18, 796. The ALJ noted that F.N.P. Torrez's findings were "provided on a check box form without explanation or support for the reported limitations." *See id.* at 18. The ALJ also found that F.N.P. Torrez's opinions were not entirely supported by her treatment notes, clinical findings, or other documentation of improvement with treatment. *See id.* Finally, the ALJ concluded that F.N.P. Torrez's opinions were somewhat inconsistent with Plaintiff's activities and other opinions in the record; and, therefore, the ALJ gave F.N.P. Torrez's opinion limited weight. *See id.*

Similarly, in October 2017, Krista Switzer, F.N.P., opined that Plaintiff was severely limited in his ability to lift/carry, push, pull, and bend and was moderately limited in his ability to walk, stand, sit, and climb. *See id.* at 18, 777. The ALJ again faulted the Family Nurse Practitioner for filling out a "check box form" without providing explanation or support for her conclusions; and the ALJ found that Plaintiff's treatment notes and history as well as his reported activities were not consistent with F.N.P. Switzer's opinion. *See id.* at 18. The ALJ also concluded that F.N.P. Switzer did not quantify Plaintiff's limitations; and, thus, the ALJ gave her opinion limited weight. *See id.*

Finally, with respect to Plaintiff's treating provider, the ALJ referred to Maygoe Richard Sheehan, M.D.'s September 2018 opinion that Plaintiff was *moderately* limited in his ability to walk, stand, sit, lift/carry, push, pull, bend, and climb. *See id.* at 19, 775. The ALJ also pointed out that, in January 2019, Dr. Sheehan opined that Plaintiff was *severely* limited in his ability to

lift/carry, push, pull and bend, moderately limited in his ability to walk, stand, and climb, and had no limitations in his ability to sit. *See id.* at 19, 773. The ALJ further noted that Dr. Sheehan opined that Plaintiff could work up to 20 hours per week and should not do heavy lifting. *See id.* The ALJ asserted that Dr. Sheehan's opinions were inconsistent with one another and were not entirely supported by his treatment notes, which documented limited positive clinical findings. *See id.* at 19. Additionally, the ALJ asserted that Dr. Sheehan completed check box forms and did not provide an explanation or support for his opinions. *See id.* The ALJ further found that Dr. Sheehan's opinions were not consistent with the medical expert's opinion and were somewhat inconsistent with Plaintiff's activities; thus, the ALJ afforded Dr. Sheehan's opinions limited weight. *See id.*

With respect to Dr. Sheehan, Plaintiff appears to challenge the fact that the ALJ did not defer to his opinion as Plaintiff's treating physician. *See* Dkt. No. 14 at 16-18. However, the Court finds that the ALJ did not err by choosing not to defer to Dr. Sheehan or in concluding that his opinions were internally inconsistent. *See* AR at 772-75. For example, the ALJ noted that, within a four-month period, Dr. Sheehan had found that Plaintiff was both moderately limited in sitting and not limited at all in sitting and that Plaintiff's limitations for other movements supposedly increased from moderate to severe. *See id.* Additionally, the ALJ did not err in finding that Dr. Sheehan's opinions were inconsistent with other evidence in the record, including Dr. Hansen's opinion. For example, Dr. Hansen found that Plaintiff could frequently reach and lift up to 10 pounds, that he could stand for up to four hours in an eight-hour workday, and that he could frequently climb stairs and ramps. *See id.* at 763-68. Dr. Sheehan's opinions regarding Plaintiff's "severe" limitations in lifting, carrying, pushing, pulling and bending were also inconsistent with Dr. Smith's and F.N.P. Moreau's 2013 opinions and

with Plaintiff's admitted daily activities, which included grocery shopping, doing laundry, cleaning his children's rooms, making beds, and cooking. *See id.* at 66-78, 468, 801-03.[4] Finally, Plaintiff faults Dr. Hansen for offering his opinion on check box forms and providing limited narratives. However, Dr. Sheehan similarly checked boxes to indicate his opinions and did not offer any narratives to support his findings. *See id.* at 772-75. For each of these reasons, the Court finds that the ALJ provided ample support for her decision to afford less than controlling weight to Dr. Sheehan's opinion.

In sum, the Court concludes that the ALJ properly considered the relevant factors, weighed the opinion evidence, and examined the records and testimony to find Plaintiff's physical RFC and that her conclusion regarding Plaintiff's physical RFC is supported by substantial evidence in the record.

### 2. *Mental RFC*

Plaintiff contends that the ALJ erred in finding that he should perform a job with a reasoning GED of two and language and math GED of one because that finding was "based solely upon the ALJ's interpretation of the requirements of Plaintiff's past work as testified by the vocational expert." *See* Dkt. No. 14 at 20. Other than the VE's testimony, Plaintiff notes that the ALJ did not identify or explain how other evidence in the record supported her mental

---

[4] Notably, the ALJ credits Plaintiff's treating nurse practitioners' reports throughout her opinion, even though they were not acceptable "medical sources" at the time based on Plaintiff's alleged onset date. *See* 20 C.F.R. § 416.927. Plaintiff does not appear to argue that the ALJ was required to consider the nurse practitioners' opinions when determining his physical RFC; and the Commissioner similarly notes that nurse practitioners were not considered acceptable medical sources at the time. *See* Dkt. No. 14 at 2-5, 10; Dkt. No. 19 at 11.

RFC finding.  *See id.* at 21.  According to Plaintiff, "[t]his is particularly an error given that the ALJ found that [he] did not have past work," and he never actually performed occupations requiring the GED levels that the ALJ used to craft her RFC finding.  *See id.*  Finally, Plaintiff argues that the ALJ "cherry picked" findings from Drs. Sheehan's and Jeanne Shapiro, Ph.D.'s opinions and disregarded F.N.P. Moreau's and Torrez's opinions.  *See id.* at 21-23.

There is only one opinion from a mental health professional in the record, which is from Dr. Shapiro.  In Plaintiff's intellectual assessment, conducted in May 2016, Dr. Shapiro concluded that Plaintiff had a full-scale IQ score of 61, which indicated that Plaintiff had a "[m]ild intellectual disability."  *See AR* at 789-90.  Dr. Shapiro concluded that Plaintiff could work, for up to 40 hours per week, "with reasonable accommodations[.]"  *See id.* at 791.  Those accommodations included that Plaintiff "should not be given any job tasks that are beyond his level of cognitive functioning."  *See id.* at 792.  Dr. Shapiro concluded that Plaintiff could "communicate adequately, maintain self-care skills, and socialize well."  *See id.* at 790.  She found Plaintiff's "community skills" were "mildly impaired" and that he was "lacking in self-direction."  *See id.*  Dr. Shapiro also determined that Plaintiff could maintain health and safety "on a simple level" and that his academic skills and work skills were impaired.  *See id.*  She also concluded that Plaintiff's home living and leisure skills were adequate.  *See id.*  As a result of her findings, Dr. Shapiro concluded that Plaintiff was moderately limited in performing complex tasks independently and in his ability to use public transportation, but he had normal functioning in following, understanding, and remembering simple directions, maintaining attention and concentrating on rote tasks, regularly attending to a routine and maintaining a schedule, and in meeting basic standards of hygiene and grooming.  *See id.*

The ALJ gave Dr. Shapiro's opinion "some weight" given her specialty, personal examination of Plaintiff, and the standardized tests she administered. *See id.* at 20. Nonetheless, the ALJ noted that Dr. Shapiro did not consider the fact that Plaintiff had a GED, and her opinions were "not entirely consistent" with Plaintiff's past work, attainment of a GED, or with other opinions of record. *See id.* at 21.

With respect to his past work, Plaintiff admitted that he had worked as a forklift operator for approximately one year and as an order puller at a warehouse while working for a temp service. *See id.* at 36-37. Plaintiff also admitted that he took the GED test in 1994 and passed the test at that time. *See id.* at 43. Plaintiff's non-attorney representative, Mr. Nutting, informed the ALJ that Plaintiff had a full-scale IQ of 61, but the ALJ responded that that was inconsistent with Plaintiff's attaining a GED, which showed that he "has some ability to learn and concentrate." *See id.* at 39-40. Mr. Nutting stated that Plaintiff did not claim the intellectual disability met Listing 12.05, but he believed Plaintiff's IQ would be relevant to his "adaptive functioning" and would "significantly diminish the unskilled occupational base." *See id.* at 40-41.

VE Festa testified that he was somewhat familiar with the GED exam, and he believed that it was possible to pass the exam without having taken any classes. *See id.* at 48. He did not know what GED level Plaintiff had in language and math, but he believed that Plaintiff's prior jobs required GED levels of two and above. *See id.* However, after looking up Plaintiff's former job as an industrial truck operator, VE Festa concluded that the GED score for that job was two for reasoning, one for math, and one for language. *See id.* at 49. Following the ALJ's hypothetical to VE Festa, she asked what the GED scores were for each of the jobs he described, to which he responded that they were two for reasoning and one for language and

math.  *See id.* at 50-55.  VE Festa concluded that jobs with those GED scores were consistent

with both Plaintiff's level of education and his past work.  *See id.* at 56.

The ALJ also gave "some weight" to F.N.P. Moreau's April 2015 opinion that Plaintiff

did not have any limitations in his ability to understand and remember instructions, carry out

instructions, maintain attention and concentrate, make simple decisions, interact appropriately

with others, maintain socially appropriate behavior without exhibiting behavior extremes, and

maintain basic standards of personal hygiene and grooming.  *See id.* at 19, 813.  Plaintiff's

treating physician, Dr. Sheehan, also came to these same conclusions.  *See id.* at 20-21, 772-73.

The ALJ found that both F.N.P. Moreau's and Dr. Sheehan's opinions were generally consistent

with the evidence in the record, such as Plaintiff's activities, work history, and ability to attain a

GED.  *See id.* at 19-21.  In addition to giving F.N.P. Moreau's opinion "some weight," the ALJ

additionally gave Dr. Sheehan's opinion "significant weight."  *See id.* at 20.

The ALJ also looked at F.N.P. Torrez's and Switzer's opinions from July 2016 and

October 2017, respectively, in which they opined that Plaintiff had moderate mental limitations.

*See id.*  The ALJ remarked that neither F.N.P. was a mental health professional, and the

limitations that they reported were not supported by their treatment notes and were inconsistent

with Plaintiff's activities and demonstrated abilities.  *See id.*  Thus, the ALJ gave both opinions

limited weight.  *See id.*

In sum, the ALJ considered VE Festa's testimony, various medical opinions, and

Plaintiff's daily activities – discussed above – to determine his mental RFC.  Accordingly, the

Court finds that the ALJ's mental RFC finding is supported by the substantial evidence in the

record.

### *3. VE Festa's job findings*

Plaintiff lastly argues that the Commissioner did not meet her burden at Step 5 to

identify significant numbers of available jobs in the national economy. *See* Dkt. No. 14 at 23.

To satisfy her burden at Step 5, Defendant must prove that there is a "significant number" of

jobs available; however, a "'significant number' of jobs is 'fairly minimal.'" *Kathy H. v. Comm'r*

*of Soc. Sec.*, No. 5:19-CV-684 (ATB), 2020 WL 3960846, *15 (N.D.N.Y. July 13, 2020)

(quoting *Rosa v. Colvin*, No. 3:12-CV-170, 2013 WL 1292145, at *9 (N.D.N.Y. Mar. 27, 2013)

(citing *Fox v. Comm'r of Soc. Sec.*, No. 6:02-CV-1160, 2009 WL 367628, at *20 (N.D.N.Y.

Feb. 13, 2009))).  "[O]ther courts have found that as little as 10,000 jobs can constitute a

significant number for the purpose of a Step Five finding." *Waldvogel v. Comm'r of Soc. Sec.*,

No. 6:16-CV-0868 (GTS), 2017 WL 3995590, *13 (N.D.N.Y. Sept. 11, 2017) (citing *Hamilton*

*v. Comm'r of Soc. Sec.*, 105 F. Supp. 3d 223, 229-31 (N.D.N.Y. 2015) (parenthetical omitted)).

After determining Plaintiff's RFC, the ALJ found that he had no past relevant work. *See*

AR at 21.  The ALJ then found, based on VE Festa's testimony, that Plaintiff could perform

other jobs existing in significant numbers in the national economy, including waxer (with 998

jobs in the national economy), table worker (with 3,079 jobs in the national economy), stuffer

(with 3,725 jobs in the national economy), laminator I (with 1,535 jobs in the national

economy), polisher eye glass frames (with 1,786 jobs in the national economy), and charger II

(with 7 jobs in the national economy), for a total of 11,130 jobs in the national economy. *See*

*id.* at 22.  VE Festa did not provide any statistics regarding these jobs' availability in the

regional or local economies. *See id.* at 51-57.  The ALJ continued to push VE Festa to provide

her with jobs with a GED score of two in reasoning and one in language and math. *See id.* at

- 23 -

52-57.  The ALJ also pressured the VE who testified at the first hearing, VE Howell, by stating that she was "gonna need a few more [jobs] 'cause [she has] to get up to 10,000."  *See id.* at 86. Ultimately, the ALJ reached the 10,000 national jobs threshold, but she only did so after securing six job titles for which Plaintiff was qualified.  When there are such low numbers of relevant jobs in the national economy, courts tend to look to the regional numbers or local availability of those job titles,  *see Terri G. v. Comm'r of Soc. Sec.*, No. 3:18-CV-0066 (CFH), 2019 WL 1318074, *11 (N.D.N.Y. Mar. 22, 2019) (Hummel M.J.); *Wayne M. v. Saul*, No. 3:20CV00465(SALM), 2021 WL 1399777, *16-*17 (D. Conn. Apr. 14, 2021); however, VE Festa did not provide those numbers in this case.  The Court is therefore not convinced, based on the evidence in the record, that the Commissioner has met her burden and demonstrated that there exists a significant number of jobs available to Plaintiff in the national economy; and, accordingly, the Court remands this case to the Commissioner for further consideration, in particular regional numbers or local availability of the job titles on which the ALJ relied to reach her conclusion that there were a significant number of jobs in the economy that Plaintiff can perform.  *See Terri G.*, 2019 WL 1318074, at *11; *Kathy H.*, 2020 WL 3960846, at *16. *But see Vining v. Astrue*, 720 F. Supp. 2d 126, 136 (D. Me. 2010).

# IV. CONCLUSION

Having reviewed the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's motion for judgment on the pleadings, *see* Dkt. No. 14, is **GRANTED**; and the Court further

- 24 -

**ORDERS** that Defendant's motion for judgment on the pleadings, *see* Dkt. No. 19, is **DENIED**; and the Court further

**ORDERS** that the Commissioner's decision denying Plaintiff disability benefits is **VACATED**, and this case is **REMANDED**, pursuant to Sentence Four of 42 U.S.C. § 405(g), for proceedings consistent with this Memorandum-Decision and Order.

**IT IS SO ORDERED.**

Frederick J. Scullin, Jr.
Senior United States District Judge

Dated:  January 12, 2022
        Syracuse, New York

- 25 -